I dissent. I am convinced from the evidence, tested by the rules of law declared in the main opinion, that the direct testimony of Riccardi as to the three acts of bribery are sufficiently supported by the other evidence to warrant the disbarment of the accused.
Speaking from the impressions I received from the record, I cannot, upon any theory consistent with his innocence, account for the refusal of the accused to hold Catterini for trial upon the evidence presented. In connection with all the other circumstances, considering the grave condition of Mrs. Nanni, and the evidence that bail was to have been denied in the beginning, the fixing of the bail at five hundred dollars cash on each of the two charges is not without significance. The gist of the crime of assault with intent to commit murder is the specific intent to take life, since the only element of murder which is lacking is the failure to execute the deadly intention. The perpetrator of such an offense is as much possessed of a malignant and abandoned heart as if he had not shown bad marksmanship, and keeping in view the hour of the assault, that the woman and child were left to die, and the other surrounding circumstances, it does not appear that those essentials of murder were lacking in this instance.
Two questions are presented on a preliminary examination — has a crime been committed, and is there sufficient cause to believe the defendant guilty thereof. (Pen. Code, sec. 872.) "Sufficient cause" has been held to have the same meaning as "probable cause" as used in section 1487 of the Penal Code. (Exparte Heacock, 8 Cal.App. 420, [97 P. 77].) It was declared in Yaner v. People, 34 Mich. 286, 289: "The examining magistrate is not to be required to nicely weigh evidence as a petit jury would, nor to discharge the prisoner where there is a conflict of evidence, or in case of a mere reasonable doubt of his guilt." Upon the facts in this case the corpus delicti
proved itself, so that the only question to be determined from the evidence was whether there was sufficient cause for believing Catterini was the assailant. In determining this question, the committing magistrate is not to finally determine the weight of the evidence, nor to resolve conflicts therein, but only to decide whether there is sufficient cause to hold the defendant for trial. In judging the state of mind of the accused in this matter it is inconceivable *Page 641 
to me that he, an experienced practitioner and judge of the police court successively for nearly twenty years, did not know and understand it was his plain duty to hold the defendant so that a jury, under the sanctions of a trial on the merits, where all the evidence is presented, could determine whether he was the guilty party. Of course, a mere mistake of judgment, or gross carelessness, yielding to influence, sympathy, or the like, on the part of the magistrate would not constitute bribery as charged herein, but in the presence of evidence such as was adduced in this case the weightiest consideration should be given to the failure of the accused to hold Catterini so that he could be tried in the superior court.
A brief reference to some of the salient features of the evidence will, I think, demonstrate this. Catterini had lived in the Nanni household, eating at the same table with the family for several months. While the room where the shooting occurred was dark, in the struggle both the woman and the child were given an opportunity to determine the identity of the assailant. Light came through a crack in the windowshade. The woman tore from the throat of the assailant a necktie which was identified as belonging to Catterini. One of his shoes was afterward found in the room. Catterini's defense, in addition to proof of good character, was an alibi. The crimes were committed in a house in the Mission district; the alibi witness was the keeper of a dance-hall on the Barbary coast, where Catterini testified he was at the hour of the shooting and during the rest of the night. When first interrogated he said he was in a room a block away when the bells announced the new year. He admitted that a revolver with three empty barrels and showing recent bloodstains, which was found in his trunk by an officer, belonged to him. He first admitted he was out in the Mission about 7:30 or 8 o'clock, but denied he was at the Nanni house on that day or night. Detective Officer Thomas Fuhrman testified Catterini told him he was in the Nanni home for a few minutes about 8 o'clock. Mrs. Nanni testified that about a month before the shooting Catterini had threatened to take her life, and, while admitting the incident, his version of what took place is that she requested him to kill her. When questioned about the tie and pin, Catterini said they were in his trunk, whereupon he was shown these articles by the officer. Then *Page 642 
he said he did not know how the officer got the pin, but stated he left the tie at the Nanni household some time before.
The principal reason assigned by the accused for discharging Catterini was that he voluntarily surrendered. The surrender took place some seventeen hours after the shooting and about the same length of time before the services of the facile Riccardi were engaged, and the work of blocking justice began. Catterini's action in surrendering may have comported either with his guilt or his innocence, for if he were guilty, going into hiding or seeking flight would be strong evidence against him, and the question ought to have been left to the jury to decide. The accused also remarked when he discharged Catterini: "It seems that a person who was present committing an act of that character would have rendered some other mark of identification which could have been made more satisfactory!" Is not the reason given by the accused for going out of his province as a committing magistrate and passing upon the merits of this case strongly indicative of an intention to exonerate the defendant for some reason other than a lack of evidence?
Riccardi testified that the reason the preliminary examination was opened at the hospital was because of two conversations he had with McDonough, the latter saying in the first he would speak to the accused about the case, and in the second that he had done so, the point being that as the case would be heard in the "Woman's Court," which the accused would preside over during the current month (each judge, it seems, holds the court for a month alternately), he would "lose jurisdiction of that case and once he loses jurisdiction we are in a nice hole." As to the eight hundred dollar promissory note: McDonough admits that he received eighty dollars commission out of a transaction he testifies was a mere accommodation to Riccardi, in addition to the one hundred dollars commission he obtained from the bail money. To my mind the entire story of McDouough as to how he came to indorse the note is palpably improbable and not entitled to credence. Assuming this testimony to be fabricated, it must be taken as inferential proof that the entire bail transaction was tainted with corruption. Why resort to an invention if the note transaction was as McDonough testified? Why was there need for McDonough furnishing security to *Page 643 
the bank? Mrs. Riccardi had about four thousand dollars on deposit there. According to McDonough, he had known Riccardi the three or four months the latter had been practicing in the San Francisco police courts. The accused also knew Riccardi. Riccardi tells of meeting the accused in saloons, including McDonough's, and in his court chambers and talking over cases with him. It may be inferred that Riccardi's identity with the "system" about which he has testified was becoming known, and, of course, even an honest judge on that bench would not fail to appreciate that the due administration of justice was imperiled by the nefarious methods of so gifted a crook as Riccardi. It may also be inferred that Catterini was not in ignorance of the system. The evidence impresses me that Catterini was neither frank nor unsophisticated. He had property, and he evidently knew what to do and where to go in order to get results. Riccardi and McDonough were soon seen in action, the judicial machinery appeared to function harmoniously, and everything moved rapidly except the decision itself. Must we shut our minds to the plain import of the evidence simply because one of the guilty participants has chosen for reasons of his own to reveal the shameful conditions shown to hedge the administration of justice in the police courts?
Riccardi has been attacked as a witness in all the modes known to the law. His testimony gives me the impression that he has no scruples which would induce him to tell the truth in a matter of importance to himself if it seemed to his detriment to do so. He probably hoped, because of his willingness to expose the system, that some concession might be made to him by the public authorities. But notwithstanding that witnesses such as Riccardi are to be distrusted, it is nevertheless the solemn duty of courts of justice in weighing their evidence, and especially where matters affecting the public good are at stake, to endeavor to extract from their testimony as much of the truth as is possible — to sift the false from the true, for we learn as judicial officers that justice is often served from the lips of guilty participants in great public wrongs.
Now, I do not accept the reasoning of the majority opinion as to how Riccardi expected to be benefited by the testimony he gave. He is presented in this proceeding by a committee of the Bar Association of San Francisco, composed of *Page 644 
earnest and sincere members of the bar faithfully endeavoring to vindicate the ethics of the profession and purge it of disreputable members, and the bench of venal judges. But it is plain to me that Riccardi realized he could only help himself by satisfying the committee that he had told the truth. According to the evidence, the committee refused to make any promises of help to Riccardi, and certainly since the Bar Association had taken up the work of cleansing the police courts, the committee would neither advocate nor tolerate any leniency being shown him if it believed he had given false testimony against a judicial officer. Moreover, the effect of sensational disclosures on the public mind is so diffused, I do not think as shrewd a man as Riccardi would expect any tangible results from that source. In my opinion, Riccardi testified under circumstances peculiarly calculated to induce him to tell the truth. He was in the toils of the law with a long term of imprisonment ahead of him. There is no evidence of personal hostility on his part toward the accused. And considering all that there is at stake to the accused and to McDonough in this proceeding, I think there is strong reason for closely scrutinizing their testimony, and especially that of the former, whose denials of the acts of bribery are couched in stereotyped and colorless phrase. I do not understand that my learned associates who have signed the majority opinion entertain any doubt that the conditions Riccardi described as the "system" did not in fact exist. But apparently because he, an admitted actor in the system, comes before us to tell the miserable story, his testimony must be practically discarded when it comes to the question whether the accused was a factor in the system. If Riccardi's story of the system is true, it follows, of course, that judges in the police courts have been debauched. I apprehend that once it is believed the accused was a part of the system there could be no hesitation in finding sufficient support for Riccardi's testimony that he acted corruptly in this particular case.
In cases of criminal confederation evidence of close relationship between the members of the enterprise is always regarded as of a most persuasive character. That an intimate relationship existed between McDonough and the accused, and that they discussed cases which came before the latter, is admitted by them. I shall not pause to dwell on *Page 645 
what is urged upon us in extenuation of their indiscretions. For fifteen years McDonough was a professional bail-bond broker, conducting the business in his saloon, which was in the neighborhood of the criminal courts. In my view, this constituted a menace to the administration of justice. It must be so regarded by every right-thinking person, whether a judicial officer or a private citizen. As a bail-bond broker McDonough did a very large business and was daily brought into contact with judges and other officials who had to act on the bail he furnished. Such contact is very apt to breed contamination, and for that reason, in my judgment, professional bondsmen should not be accepted by courts of justice. McDonough kept track of the volume of his bail brokerage business for income tax purposes, but otherwise preserved no record of bail transactions. In this proceeding he was not able to fortify his testimony by books of account of any sort. It is not difficult to understand why he kept no records. When bail has been declared forfeited the sureties may seek to have the order of forfeiture discharged (Pen. Code, secs. 1305-1307). Is it not inherently probable that in such matters McDonough would use every means within his power to avoid the loss of his money? His bail-bond business is as much on trial in this proceeding as is Riccardi's credibility or the integrity of the accused. In view of all the surrounding circumstances it is against every rule of probability that the relationship between the accused and McDonough was of the character they have both described. It must shock the sense of propriety of everyone that a relationship could exist between a judge and a bail-bond broker under the circumstances shown, for it would tend to scandalize the administration of justice, create suspicion, forfeit public confidence and respect, invite corruption, and be directly responsible for the very conditions described in the evidence in this proceeding.
I am of the opinion that there is sufficient evidence which is not "purely guesswork" to support the testimony of Riccardi that the accused was bribed in this case through the medium of McDonough, and that the conversation between Riccardi and the accused as to the amount of the bribe did take place. This, in itself, would constitute an admission of guilt. I have not attempted to reconcile with the evidence in the Catterini case the action of the prosecuting officer as *Page 646 
to the sufficiency of the evidence to hold Catterini for trial, and I shall therefore leave him to his own explanations.
Under the evidence in the Pastiango case every reason is shown for and no reason against holding the defendant for trial. The accused testified he believed the defendant was guilty of the act, but that, it was not done with an "impure motive." But, notwithstanding this, after the felony charge was dismissed, the defendant was prosecuted and convicted under Ordinance 1059 upon the identical evidence offered under the felony charge. This ordinance prescribes an offense where any lewd, indecent, or obscene act is committed. The meaning of section 288 (the felony statute) is "lewd and lascivious" conduct, when accompanied by a certain specific intent. But even if we assume the accused dismissed the felony charge for the reasons given, upon what theory can his action in suspending the sentence of three months on the misdemeanor charge, thereby permitting the defendant to go unwhipped of justice for tampering with a girl under fourteen years of age, be explained or defended? I think this case also furnishes corroborating evidence.
Even assuming in the Spinelli matter that the accused did not fix the bail, do not the surrounding circumstances tend to corroborate the testimony of Riccardi? No satisfactory explanation is given by the accused for taking up the question of bail in this case. This fact, however, standing by itself might not be significant. But it does not seem likely that Riccardi would go to the home of the accused with the sureties
in the absence of some understanding or arrangement. Besides, the accused admitted that he "depended on Riccardi" as to the sufficiency of the undertaking. This admission certainly shows something more serious than "a gross neglect of duty." The transaction occurred in November, 1918, and by this time, of course, the accused knew of Riccardi's character and activities. It was stated Riccardi's gross yearly earnings from his practice in the Hall of Justice were between forty thousand dollars and sixty thousand dollars, out of which he claimed he only netted twelve thousand dollars. Moreover, if Riccardi's story was an invention it is not likely he would have placed the amount of the bribe at the insignificant sum of fifty dollars. In my opinion, the evidence in this matter is corroborative of Riccardi's testimony *Page 647 
and explains why the accused "depended" upon him in the acceptance of the undertaking.
I have given my appraisal of the evidence. I am unable to believe that in the Catterini and Pastiango cases the accused, an experienced judge, did not reach the conclusion there was sufficient cause to hold the defendants for trial. Human life has been forfeited and the liberty of the individual taken under the forms of law upon less convincing evidence than that presented in these cases — upon a preliminary examination. But a failure by the accused to find there was sufficient cause would not, of course, call for disbarment if his action upon any hypothesis of innocence could be attributed to a mistaken conception of the law or the evidence, or an erroneous or otherwise unwarranted exercise of discretion. In none of these transactions is it claimed or suggested the accused was moved by personal appeal, sympathy, or compassion, for if he was so influenced his conduct would not be corrupt within the meaning of the accusation, however inexcusable it may have been. But in my study of the evidence I could not accept the conclusion announced in the prevailing opinion, for I reached a point where neither the self-confessed criminality of Riccardi, nor the presumptions of innocence and that his official duty was regularly performed with which the accused stood clothed, could avail against the plain import and inherent probabilities of the evidence indicative of guilt.
I am of the opinion that the accused should be disbarred.